UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOEL WHITEHOUSE, ELIANA WHITEHOUSE and JUSTIN WHITEHOUSE, Minor Children of JOEL WHITEHOUSE, <br><br>Plaintiffs, <br><br>v. <br><br>MAYOR JOHN PIAZZA, CHIEF OF POLICE, KEVIN SHAUGHNESSY, UNKNOWN LEMONT POLICE OFFICERS, and THE VILLAGE OF LEMONT, <br><br>Defendants. | No. 05 C 1638 <br><br>Judge Nan R. Nolan |

## MEMORANDUM OPINION AND ORDER

On February 22, 2005, Joel Whitehouse's eight-year-old son, Justin, complained that the seven-year-old son of Lemont, Illinois Mayor John Piazza had hit and scratched him while riding home on a school bus. At the time, Whitehouse was campaigning for public office as a trustee for the Village of Lemont, and was part of a political group that opposed Mayor Piazza. When Piazza showed up at Whitehouse's home three days later, an otherwise minor spat turned into a federal case. On March 21, 2005, Joel Whitehouse filed suit alleging that Piazza and Lemont Police Chief Kevin Shaughnessy retaliated against him for exercising his First Amendment right to political speech, in violation of 42 U.S.C. § 1983. Whitehouse further charged Piazza with assault, battery, and trespass, and named Justin and his daughter Eliana (approximately seven years old) as Plaintiffs to a claim of intentional infliction of emotional distress. Whitehouse finally alleged that the Village of Lemont is liable to Plaintiffs for Chief Shaughnessy's actions under the Illinois Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102.

The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Defendants have each filed separate motions for summary

judgment seeking dismissal of all Plaintiffs' claims. For the reasons set forth here, the motions are granted.

## **BACKGROUND**[1]

Whitehouse is a licensed Illinois attorney who worked as an assistant state's attorney at the Cook County State's Attorney's Office from 1984 to 1993. He is currently self employed as a criminal defense attorney and private detective, and he lives in Lemont, Illinois with his wife, Dr. Jamie Lynn Stalker, and their two minor children, Justin and Eliana Whitehouse. (Def. Facts ¶¶ 3, 13.)[2] Piazza, also a Lemont resident, has served as the Village's Mayor since April 2001. (*Id.* ¶ 4.) Shaughnessy has served as Lemont's Chief of Police since January 4, 2004 and has more than 26 years of experience in police work. The Village selected Shaughnessy from among a pool of candidates that was created by an independent search firm, and his appointment was confirmed by Mayor Piazza. (*Id.* ¶ 5; Pl. Facts ¶ 1.)[3] Shaughnessy understood that he was not employed under a contract and that decisions concerning his employment were to be made by the Village board, which consisted of individuals who were on the same political ticket as Piazza. (Pl. Facts ¶ 13; Shaughnessy Dep., at 27-28.)

### A.   **The Political Backdrop**

In 2003, Whitehouse campaigned to become a trustee for the Village of Lemont. His bid for public office was unsuccessful, but he decided to run for trustee a second time between January and April 2005. In this second campaign, Whitehouse ran as part of the "Citizens of Lemont for

---

[1] Defendants have moved to have certain facts in their Local Rule 56.1 statement deemed admitted based on Plaintiffs' failure to provide record citations supporting their denials. To the extent the court does not address a response set forth by Plaintiffs, the motion is granted. Otherwise, the motion is denied.

[2] Defendants' Local Rule 56.1 Joint Statement of Material Facts in Support of their Motions for Summary Judgment is cited as "Def. Facts ¶ __."

[3] Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Pl. Facts ¶ __."

2

Good Government" campaign, a political group opposed to Mayor Piazza, who was also up for re-election that year. (Def. Facts ¶¶ 14, 15.)

**B.      The February 22, 2005 Bus Dispute**

On February 22, 2005, while Whitehouse's campaign was underway, eight-year-old Justin Whitehouse complained that Piazza's seven-year-old son had hit and scratched him during a ride home on a school bus. (*Id.* ¶¶ 16-18.) Whitehouse called the school principal, Patricia Vidinich, and asked to see a copy of the videotape that recorded the boys' bus ride together. (*Id.* ¶ 19.) At the time, Whitehouse was characterizing the incident as an assault and/or battery. According to Ms. Vidinich, Whitehouse told her he thought the incident was "political" because he was running for office against Piazza. (*Id.* ¶ 19; Ex. 2 to Whitehouse Dep., at 0028.) Indeed, Whitehouse's wife sent Ms. Vidinich an email message stating that "there is tension related to [the upcoming election] and prevents me from doing the usual neighborly thing," i.e., calling the parents directly. (Ex. 2 to Whitehouse Dep., at 0029.)

In any event, Ms. Vidinich informed Whitehouse that pursuant to the school district's policy, school bus videotapes are for internal use only. (Def. Facts ¶¶ 20, 21.) Whitehouse was not satisfied with this response and told Ms. Vidinich that he "was going to sue everybody and call Channel 5." (Whitehouse Dep., at 90; Vidinich Dep., at 30.) When Whitehouse received the same response from Sharon Phelan, the Transportation Director for Lemont-Bromberek School District 113A, he again became upset, raised his voice, and threatened to call the newspapers and sue. (Phelan Dep., at 44-49.) Whitehouse next contacted the Cook County State's Attorney's Office in the early afternoon of February 25, 2002 to express his concern that the school bus videotape had been, or was going to be destroyed. Whitehouse reported his belief that the tape might show

3

potentially criminal conduct by Piazza's first-grade son, and his intention to notify the police if the tape showed an "outright beating."[4]  (Def. Facts ¶ 23.)

**C.     The February 25, 2005 Confrontation**

It is clear from Whitehouse's actions that he was upset about the bus ride incident, and it appears that Piazza was as well.  Indeed, it is undisputed that Piazza drove over to Whitehouse's home on the evening of February 25, 2005 to discuss the incident, and that Whitehouse ended up calling 911 and attempting to file charges against Piazza.  The specific details of the encounter, however, are hotly disputed.

Whitehouse claims that he was out playing with his kids in the garage and organizing items in his car when Piazza drove up, parked his car with the two passenger-side wheels on the driveway, and walked briskly onto the driveway towards Whitehouse, smelling of alcohol. (Whitehouse Dep., at 121-22, 126; Pl. Facts ¶¶ 2, 3, 6.)  Justin was playing in the garage at the time, and Eliana was sitting in the car looking out the back window.  (Pl. Facts ¶ 7; Whitehouse Dep., at 121.)  According to Whitehouse, Piazza yelled at him to leave the kids out of the election, swore at him, chest-bumped him three times, and tried to provoke a fight by stating that he was going to "kick Whitehouse's fucking ass."  (Def. Facts ¶ 25; Pl. Facts ¶¶ 4, 5.)  Whitehouse instructed his children to get inside the house and told Piazza several times to leave his premises. Piazza responded by saying "make me," so Whitehouse called 911 for police assistance, seeking to have Piazza arrested.  Piazza then got in his car and drove away.  (Pl. Facts ¶¶ 5,6.)

Piazza disagrees with Whitehouse's characterization of this interaction.  He explains that he drove to the Whitehouse residence after his wife told him about Whitehouse's attempts to obtain the bus videotapes.  Piazza and his wife both felt that Whitehouse was going after the kids as part of his campaign, and Piazza wanted to ask Whitehouse to leave the children out of the political

---

[4]     The parties do not indicate what, if anything, happened with respect to the videotape. It does not appear that Whitehouse pursued charges against Piazza's first-grade son.

4

race. (Def. Facts ¶¶ 92, 93; Piazza Dep., at 80.) Piazza denies that he assaulted or battered Whitehouse and emphasizes that he left when Whitehouse threatened to call 911. (*Id.* ¶ 27, 97.) Piazza and Whitehouse do agree that the entire interaction lasted between three and five minutes. (*Id.* ¶ 28; Whitehouse Dep., at 128; Def. Resp. ¶¶ 3, 4.)[5]

**D.     The 911 Call**

The Lemont Police Department received Whitehouse's 911 call at 4:16 p.m. Sergeant Jerrold Lehmacher, an officer with 18 years of experience, was supervisor of the day shift that day and was scheduled to be the acting commander after 4:00 p.m. (Pl. Facts ¶¶ 10, 18.) Chief Shaughnessy, however, was still at the station when the call came in. (Def. Resp. ¶ 10.) In fact, before Shaughnessy even heard the dispatch, he received a cellular phone call from Piazza informing him of Whitehouse's 911 call. (Pl. Facts ¶ 11.) At the time, Shaughnessy knew that Whitehouse was running for trustee and was an opponent of Piazza's political party. (*Id.* ¶ 13.)

Lehmacher, too, realized that the 911 disturbance involved Whitehouse and Piazza and notified dispatch that he would respond to the call. (*Id.* ¶ 19.) Shaughnessy, however, called Lehmacher and said that he had already spoken with Piazza and wanted to meet with Lehmacher before he went to the Whitehouse residence. (*Id.* ¶¶ 14, 19, 20.) According to Defendants, it was not unusual for Shaughnessy to call Lehmacher, and Shaughnessy had information about the call that would be helpful, including the identity of the other party (i.e., Piazza). (Def. Facts ¶ 31; Def. Resp. ¶¶ 14, 19; Lehmacher Dep., at 28-29; Shaughnessy Dep., at 41.) Defendants also claim that Chief Shaughnessy had safety concerns because the 911 call was dispatched as being an incident "in-progress." (Def. Resp. ¶ 14; Shaughnessy Dep., at 36-37.) Whitehouse denies this, noting Lehmacher's testimony that he had never before received a call from Shaughnessy regarding a

---

[5]     Defendants' Joint Reply to Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts is cited as "Def. Resp. ¶ __."

disturbance,[6] and Shaughnessy's testimony that the only information he had from Piazza was that Piazza "had some words with Whitehouse [so] expect a 911 call." (Lehmacher Dep., at 25, 28, 29; Shaughnessy Dep., at 18-20.) Notably, Defendants themselves admit that Lehmacher figured out on his own that the disturbance involved Piazza and Whitehouse based on the vehicle description and address, and that Lehmacher drove to the Whitehouse residence at a safe speed because he knew that this was not an 'in-progress" call. (Def. Facts ¶ 32; Pl. Facts ¶ 19; Def. Resp. ¶ 19.)

In any event, Lehmacher met Shaughnessy one block east of the park district about five to ten minutes after Piazza's call. (Pl. Facts ¶ 15.) The two men briefly discussed the situation and proceeded to the Whitehouse residence in separate cars. They arrived at 4:26 p.m., approximately ten minutes after the police first received the 911 call. (Def. Facts ¶¶ 29-31, 34.) Shortly thereafter, Officer Peter Moranda of the Lemont Police Department arrived at the residence as Shaughnessy and Lehmacher were taking Whitehouse's statement about the incident. (*Id.* ¶ 36.) Whitehouse told the officers that Piazza came onto his property, yelled at him, and bumped him in the chest to provoke a fight. (*Id.* ¶ 41; Pl. Facts ¶ 20.) Whitehouse also said that he wanted to file misdemeanor charges against Piazza for assault, battery and trespass. (Pl. Facts ¶ 21.) At the time, Whitehouse did not have any physical injuries and there were no visible indications of a physical confrontation at the scene. (Def. Facts ¶ 42.)

While Whitehouse was speaking with the police, his son Justin stepped out into the garage and stood behind a vehicle to observe what was transpiring. Justin could not hear what the men were saying, but Whitehouse ultimately saw his son and instructed him to come out and tell Chief Shaughnessy about the incident with Piazza. (*Id.* ¶¶ 44-46.) Shaughnessy and Lehmacher both objected that it was inappropriate to involve Justin in the matter due to his age. According to Justin, Chief Shaughnessy then came over to him and, before giving Justin a chance to recount the events

---

[6] The parties agree that a "disturbance" is something less than a fight. (Pl. Facts ¶ 18.)

from that evening, told him that nothing had happened except a friendly conversation between Piazza and Whitehouse. (*Id.* ¶¶ 48-51.) Justin testified that he was afraid of Chief Shaughnessy but he nevertheless re-enacted the events for the officers. During his re-enactment, Justin never said or demonstrated that Piazza had chest-bumped Whitehouse. (*Id.* ¶¶ 53, 54; Justin Dep., at 83-84, 99.)

Chief Shaughnessy advised Whitehouse that based on the facts developed during this preliminary investigation, including the fact that he produced his son as a witness but Justin did not corroborate Whitehouse's story as to any physical contact, the police would prepare and file reports but would not make any arrests or file any complaints pending further investigation. (*Id.* ¶ 58.) After leaving the Whitehouse residence, Chief Shaughnessy drove to Piazza's house to investigate Whitehouse's claims. Piazza, however, was not at home. (*Id.* ¶ 59.) Shaughnessy called Piazza later that evening and told him about Whitehouse's allegations. Piazza admitted going to the Whitehouse residence but denied any physical contact with Whitehouse. (Shaughnessy Dep., at 138-39.)

**E.     The Police Investigation**

Based on their conversations with Whitehouse and Justin, Chief Shaughnessy, Sergeant Lehmacher, and Officer Moranda prepared independent police reports of the incident with Piazza. (Def. Facts ¶ 60.) According to Lehmacher's report, which Whitehouse concedes is accurate, Whitehouse made the following claims:

> Victim [Whitehouse] states that on above time and date, while the victim was in his garage, the offender [Piazza] stopped his vehicle in the street and came onto the victim's driveway threatening and swearing at the complainant trying to provoke the victim into a fight. The offender then approached the victim and bumped the victim chest to chest to further provoke the victim into a fight. The entire time the victim warned the offender to leave his property. As the victim dialed 911, the offender left the area in his vehicle at a high rate of speed. The victim does wish to pursue the matter and sign complaints against the offender.

7

(*Id.* ¶ 62; Offense Report of 2/25/05, Exhibit 1 to Lehmacher Dep.)  Lehmacher also noted in his report that Whitehouse's children were in the garage at the time of the incident but were unable to give "a clear account of the events that occurred." (Offense Report of 2/25/05, Ex. 1 to Lehmacher Dep., at 2.)  Chief Shaughnessy's Supplemental Report further stated that Officer Moranda had interviewed a neighbor north of Whitehouse's residence but that no one had heard or seen anything.  (Ex. 1 to Shaughnessy Dep., at 3.)

Later on the evening of February 25, 2005, Whitehouse and his attorney and friend, Richard Kling, went to the police station to see the reports and file charges against Piazza.  (Pl. Facts ¶ 24.) Lehmacher read his draft of the police report to both men and asked Whitehouse if he would like to write down his personal account of the incident.  Whitehouse declined, apparently out of concern that Piazza would see his version and either "mirror" the statements or "have a week to work on his statement."  (Def. Facts ¶ 64; Lehmacher Dep., at 63-64, 92-94; Whitehouse Dep., at 201-02.)  To Kling's surprise, Lehmacher then agreed to give Kling the reports and criminal complaints in a sealed envelope – referred to as a "packet" – to take to the State's Attorney's Office to have charges filed.  Chief Shaughnessy, however, called and instructed him not to do so.  (Pl. Facts ¶¶ 27, 28; Lehmacher Dep., at 71-72; Def. Facts ¶ 67.)

Defendants emphasize that Whitehouse and Kling were able to read the police reports, and that Kling did not expect to obtain copies at that time.  To the contrary, Kling testified that "I didn't see it unusual him saying, No, I can't give you copies.  That is usual.  I would have been surprised if he said, Sure, I will make you copies."  (Kling Dep., at 43-44; Def. Facts ¶ 67.)  In addition, Whitehouse never again requested copies of the reports prior to his deposition on December 15, 2005.  Defendants also note that Lehmacher testified at his deposition that he was not in fact prepared to provide a "packet" as he did not yet have copies of the reports drafted by Chief Shaughnessy and Officer Moranda, and the case was still under evaluation.  (Def. Facts ¶ 67; Def. Resp. ¶ 27; Lehmacher Dep., at 82, 91-92.)  Plaintiffs dispute this assertion, citing Lehmacher's

testimony that Shaughnessy had never before instructed him to not give a party a copy of the reports and complaints. (Lehmacher Dep., at 74.) Defendants respond that the Lemont Police Department has a policy prohibiting the release of police reports relating to an ongoing investigation. (Def. Facts ¶ 65.)

Whitehouse denies that there was an ongoing investigation, arguing that the police department never made any additional inquiries into his claims. It is undisputed, however, that copies of the police reports were sent to the State's Attorney's Office. (Def. Resp. ¶ 32; Lehmacher Dep., at 123-24.) Whitehouse does not deny this fact, but cites testimony from Assistant State's Attorney Peter Troy that the Lemont police officers asked him only whether there was sufficient evidence to charge Piazza with residential burglary, and not any other charge (i.e, assault, battery, and trespass). (Pl. Facts ¶¶ 33, 34; Troy Dep, at 14-16.) In any event, shortly thereafter, Joseph Magats, an Assistant State's Attorney assigned as a Deputy Supervisor to the Public Corruption Unit, met with Troy and a Commander or Deputy Commander from the Lemont Police Department to discuss the possibility of filing charges against Piazza. (Magats Dep., at 7-8.) Mr. Magats does not recall any discussion of assault or battery charges, but he apparently concluded that there was no basis for any felony charges against Piazza. (*Id.* at 13.)

**F.      Whitehouse's Complaint to the Cook County State's Attorney's Office**

In the meantime, on February 28, 2005, Whitehouse on his own contacted Cook County Assistant State's Attorneys Tom Bilyk and Robert Podlasek, complaining that Piazza had attacked him at his house and that the police had attempted to cover-up the incident. Whitehouse asked Bilyk and Podlasek to investigate Chief Shaughnessy's actions in "calling off" the 911 call; failing to interview a child witness; and conducting the investigation despite his status as an "interested" witness. (Def. Facts ¶ 73.) Bilyk investigated Whitehouse's allegations, including speaking with Shaughnessy, Lehmacher, and Lieutenant Colonel Jack Garcia of the Illinois State Police, and reviewing the police reports and 911 tapes. Chief Shaughnessy explained to Bilyk that "since there

9

was no offender on the scene, no physical evidence to the crimes alleged, and conflicting recall of the details between Whitehouse and his own witness, his son, that a report would be taken and followed up on, but no complaints would be signed at this time." (*Id.* ¶ 75; Supplemental Report, Ex. 1 to Shaughnessy Dep., at 2.) Like Troy and Magats, Bilyk ultimately concluded that there was no evidence to support any felony crime of obstruction or conspiracy between the police department and Piazza. (*Id.* ¶ 74; Bilyk Dep., 11-13, 18, 21; Bilyk Aff. ¶ 11.) As for any misdemeanor allegations, Bilyk told Whitehouse that he could have the Bridgeview or Markham courthouses issue a summons for Piazza to appear on his complaints, but that "our office or Lemont does not need to be involved in that."[7] (*Id.* ¶ 76; Bilyk Dep., at 16.)

### G. Whitehouse's Publicity Statements

At some point shortly after the events of February 25, 2005, Whitehouse's political campaign prepared a press release titled "*Lemont Mayor Piazza Assaults Opposing Candidate in Front of His Children – Police Chief Admits Holding Back Officers on 911 Call Against Mayor.*" Whitehouse does not recall to whom the press release was sent, but he now admits that it contained inaccurate information, including a statement that the police had "refus[ed] to take a police report" regarding the incident with Piazza. (Def. Facts ¶¶ 69, 70.) Approximately one month later, on March 25, 2005, Whitehouse sent an email message to an investigative reporter with the Chicago Sun-Times regarding Justin's alleged "attack" on the bus and the subsequent incident between Whitehouse and Piazza. In addition, the paper ran a newspaper article about the incident just days before the April 2005 Municipal elections. Whitehouse nonetheless lost his campaign for Village trustee. (Def. Facts ¶¶ 15, 71, 98.)

### H. This Lawsuit

---

[7] It does not appear that Whitehouse pursued his options with the Bridgeview or Markham courthouses.

On March 21, 2005, Whitehouse filed suit against Piazza, Shaughnessy, and several unknown Lemont police officers, alleging that Defendants (1) retaliated against him for exercising his First Amendment right to political speech, in violation of 42 U.S.C. § 1983; and (2) conspired to deny Whitehouse equal protection under the law. Whitehouse further alleged that the Village of Lemont was liable for Chief Shaughnessy's misconduct under the Illinois Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102, which directs a municipality to pay any tort settlement or compensatory damages for which it or an employee acting in the scope of employment is liable. In addition, Whitehouse brought charges against Piazza for assault, battery, and trespass, and named his children as Plaintiffs to claims of intentional infliction of emotional distress ("IIED"). Notably, Whitehouse's own wife had no idea that he had named their children in a lawsuit until several months later. (Def. Facts ¶ 77.) In any event, Whitehouse filed an Amended Complaint on June 24, 2005, clarifying his First Amendment retaliation claim and deleting the conspiracy claim.

The Defendants separately moved to dismiss the Amended Complaint, and on October 25, 2005, the district court denied Piazza's and Shaughnessy's motions, and denied the Village's motion except as to Whitehouse's claim for indemnification for punitive damages. *Whitehouse v. Piazza*, 397 F. Supp. 2d 935 (N.D. Ill. 2005). In early 2006, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). On February 14, 2006, the court granted Defendants' oral motion to dismiss the "Unknown Lemont Police Officers" as defendants. (Minute Order of 2/14/06, Doc. 66.) The remaining Defendants have now separately moved for summary judgment on all claims.[8]

---

[8] To the extent Defendants repeat or adopt arguments set forth by their co-Defendants, the court addresses the theories only once.

**DISCUSSION**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Where factual matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; he must offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001).

Whitehouse claims that Piazza and Shaughnessy retaliated against him for exercising his First Amendment right to political speech, and that Piazza is additionally liable for assault, battery, trespass, and intentional infliction of emotional distress. Whitehouse also insists that the Village must indemnify Shaughnessy's violations to the extent Shaughnessy was acting within the scope of his employment. The court addresses each argument in turn.

**A.     First Amendment Retaliation**

Whitehouse claims that Piazza and Shaughnessy violated his First Amendment rights as protected by § 1983 by working together to prevent him from filing legitimate criminal charges against Piazza in retaliation for Whitehouse's political opposition to Piazza and threat to expose his misconduct. To establish such a claim, Whitehouse must make a threshold showing that the conduct complained of was committed by a person acting under color of state law, and that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or laws of the

United States. *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003). *See also Gray v. City of Chicago*, 159 F. Supp. 2d 1086, 1089 (N.D. Ill. 2001) ("Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred.") (internal quotations omitted). Neither party disputes that Whitehouse has made such a showing here based on Piazza's status as Mayor of Lemont, and Shaughnessy's status as Chief of Police.

The Seventh Circuit has never specifically determined the standards to be applied in § 1983 retaliation claims where, as here, there is no employment relationship between the parties. *See, e.g., Villagrana v. Village of Oswego*, No. 04 C 4603, 2005 WL 2322808, at *2 (N.D. Ill. Sept. 22, 2005). Only Piazza has even addressed this issue, arguing that the proper formulation requires a showing that (1) the speech was constitutionally protected; and (2) the speech was a substantial or motivating factor in the retaliatory action. Defendants would then have an opportunity to show that the action would have been taken in the absence of protected speech. (Piazza Mem., at 4 (citing *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004).)[9] Courts in other jurisdictions have adopted a slightly different test, requiring a non-employee plaintiff to prove that (1) the plaintiff was engaged in constitutionally protected speech; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

In *Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142 (N.D. Ill. 2001), an Illinois district court found "no meaningful distinction between the employment and non-employment cases" and adopted the formulation set forth by the Seventh Circuit in *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187 (7th Cir. 1995). *Id.* at 1145. Under that test, a plaintiff must show that (1) he suffered an

---

[9] Piazza's Memorandum of Law in Support of Motion for Summary Judgment is cited as "Piazza Mem., at __."

adverse action motivated by the exercise of his right to free speech; and (2) the complained-of action was sufficiently adverse to present an actual or potential danger that speech will be chilled. *DeGuiseppe*, 68 F.3d at 191.  The court agrees that there is no meaningful distinction between employee and non-employee retaliation cases and finds that Whitehouse must prove that (1) his speech was constitutionally protected; (2) he suffered an adverse action motivated at least in part by that speech; and (3) the complained-of action was sufficiently adverse to present an actual or potential danger of deterring free speech.  *See, e.g., Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

### 1.    Protected Speech

In this case, there is no dispute that Whitehouse engaged in constitutionally protected speech by stating his intent to disclose the threats and intimidations of Piazza and Shaughnessy, his political opponents.  *Whitehouse*, 397 F. Supp. 2d at 939-40; *Belk v. Town of Minocqua*, 858 F.2d 1258, 1262 (7th Cir. 1988) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)) (defendant could not terminate plaintiff's employment "because of her exercise or threatened exercise of a constitutionally protected right.")  The only question is whether Defendants retaliated against him for these statements.

### 2.    Adverse Action

Whitehouse claims that Piazza and Shaughnessy conspired to prevent him from filing assault, battery, and trespass charges against Piazza, and that he "was denied the benefit of a fair and thorough investigation because of his politics." (Pl. Resp., at 8.)[10]  Whitehouse argues that Shaughnessy improperly intervened in Sergeant Lehmacher's response to the 911 call; failed to interview Piazza; improperly prevented Lehmacher from giving him copies of the police reports; asked the State's Attorney's Office only about the possibility of filing felony, as opposed to

---

[10]    Plaintiffs' Memorandum in Opposition to Summary Judgment is cited as "Pl. Resp., at __."

misdemeanor charges; and "swept under the rug" his claims about Piazza's criminal conduct. (*Id.* at 8-10.) The evidence presented, however, does not support these assertions.

The Lemont Police Department received Whitehouse's 911 call at 4:16 p.m. on February 25, 2005. The court agrees that there is evidence that Chief Shaughnessy deliberately intervened in Sergeant Lehmacher's response to that dispatch based on the cellular phone call he received from Mayor Piazza. Defendants claim that Shaughnessy had pertinent information relating to an "in-progress" 911 call, but Lehmacher already knew that the call involved Whitehouse and Piazza based on the vehicle description and address, and it is undisputed that the call was not in fact "in-progress" because Piazza had left the premises.

Nevertheless, Shaughnessy and Lehmacher both arrived at the Whitehouse residence approximately ten minutes after receiving the 911 call, and a third officer, Peter Moranda, arrived shortly thereafter. All three men took statements from Whitehouse and his son Justin as to what had transpired. Whitehouse suggests that Chief Shaughnessy tried to intimidate Justin into saying that nothing had happened. Assuming this is true, it is undisputed that Justin proceeded to disagree with the Chief and to re-enact his version of the events. Notably, Justin did not say anything about Piazza chest-bumping his father. (Justin Dep., at 83-84, 99; Def. Facts ¶¶ 53, 54.) Whitehouse concedes, moreover, that there were no visible signs of an altercation and he had no physical injuries of any kind. (Def. Facts ¶ 42.)

After completing the interview with Whitehouse and Justin, Officer Moranda conducted further investigation by interviewing the neighbors to the north of the property. Chief Shaughnessy, in turn, drove to Piazza's residence to interview him. Piazza was not at home at that time, so Shaughnessy called him on the phone later that night to discuss Whitehouse's charges. (*Id.* ¶ 59; Shaughnessy Dep., at 138-39.)

That same evening, Shaughnessy, Lehmacher, and Moranda all prepared separate police reports regarding Whitehouse's call. Significantly, Whitehouse admits that Lehmacher's report was

15

accurate. (Def. Facts ¶ 62.) When Whitehouse and his attorney, Richard Kling, arrived at the police station asking to see the reports and file charges, Lehmacher read his draft report to both men and allowed them to read it as well. (Def. Facts ¶¶ 64, 67.) Lehmacher also offered to let Whitehouse write down his personal account of the events, but Whitehouse declined. It appears that Lehmacher did originally agree to give Kling copies of the police reports until he received a call from Shaughnessy, but Kling himself saw nothing unusual about this decision: "I didn't see it unusual him saying, No, I can't give you copies. That is usual. I would have been surprised if he said, Sure, I will make you copies." (Kling Dep., at 43-44; Def. Facts ¶ 67.)

In addition to these initial investigative steps, the Lemont Police Department sent copies of the police reports to Peter Troy and Joseph Magats of the State's Attorney's Office. Both men concluded that there was no basis for any felony charges against Piazza. Whitehouse objects that Shaughnessy somehow prevented Troy and Magats from looking into his true charges for misdemeanor assault, battery, and trespass. Whitehouse's own contacts at the State's Attorney's Office, however, found no basis for that office or for the Lemont Police Department to pursue such charges. Assistant State's Attorney Tom Bilyk expressly told Whitehouse that he found no evidence to support any felony crime of obstruction or conspiracy between the police department and Piazza, and that Whitehouse could pursue misdemeanor charges on his own by issuing a summons through the Bridgeview or Markham courthouses. (Def. Facts ¶¶ 73, 74, 76.) It appears that Whitehouse decided not to pursue this option.

Viewing the facts most favorably to Whitehouse, the evidence demonstrates that Shaughnessy and the Lemont Police Department did investigate Whitehouse's allegations and did not retaliate against him for any protected political speech.[11] Whitehouse claims that Shaughnessy

---

[11] Notably, Whitehouse admits that shortly after the events of February 25, 2005, his political campaign prepared an inaccurate press release wrongly accusing the Lemont Police Department of failing to take police reports relating to the Piazza incident. (Def. Facts ¶¶ 69, 70.)

should have assigned the investigation to another jurisdiction, noting Lehmacher's testimony that that is what he would have done to avoid the appearance of bias. (Pl. Resp., at 9; Pl. Facts ¶ 22; Lehmacher Dep., at 47-48.) Whitehouse, however, has not presented any facts demonstrating any bias in the handling of his investigation. As discussed above, the police investigated the allegations, and Whitehouse's personal contacts at the State's Attorney's Office confirmed that there was no basis for pressing official charges against Piazza. Whitehouse concedes that there is no constitutional right to have another person criminally prosecuted, and he has failed to establish any other actionable retaliation by Defendants. *See, e.g., Lunini v. Grayeb*, 395 F.3d 761, 772 (7th Cir. 2005) ("[W]e decline to take the unprecedented step of implying a general constitutional police duty to arrest certain individuals during a response to an isolated domestic incident. Such a ruling would threaten to turn every police house call into a potential federal constitutional lawsuit."); *Johnson v. City of Evanston*, 250 F.3d 560, 563 (7th Cir. 2001) ("[A]s a rule, the Constitution does not require states to protect citizens from each other.") Thus, Piazza and Shaughnessy are not liable under § 1983 and their motions for summary judgment on this claim are granted.

**B.    Indemnification**

Having concluded that neither Piazza nor Shaughnessy retaliated against Whitehouse in violation of § 1983, the court grants summary judgment in favor of the Village of Lemont on Whitehouse's claim for indemnification under 745 ILCS 10/9-102.[12]  *See Horstman v. County of DuPage*, 284 F. Supp. 2d 1125, 1131 (N.D. Ill. 2003) (the Illinois Governmental Employees Tort Immunity Act "does not bestow a right of action whereby a plaintiff may sue a municipality directly; rather, it makes the municipality an insurer for its employees.")

**C.    State Law Torts**

Whitehouse has alleged a variety of state law claims against Piazza, including assault, battery, trespass, and intentional infliction of emotional distress.  Defendants argue that these claims should all be dismissed along with the federal claims for lack of jurisdiction, and that there are no facts to support an IIED claim in any event.  The court agrees.

### 1.    Intentional Inflection of Emotional Distress

In Count IV of the Amended Complaint, Whitehouse charges Piazza and Shaughnessy[13] with intentional infliction of emotional distress on his two minor children, Justin and Eliana.  To establish a claim for IIED, Whitehouse must show that (1) the conduct complained of was truly extreme and outrageous; (2) Piazza intended his conduct to inflict severe distress, or knew that there was a high probability that his conduct would inflict such distress; and (3) the conduct in fact caused severe emotional distress.  *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 447, 828 N.E.2d 323, 333 (2d Dist. 2005); *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006).  In determining whether conduct is extreme and outrageous, courts apply an objective standard based on all of the

---

[12] The court notes that Whitehouse agrees that the Village cannot be held liable for any of Piazza's alleged conduct, as he was acting as a private citizen in this case.  (Pl. Resp., at 12.)

[13] The Amended Complaint does not identify Shaughnessy as a defendant to the IIED claim.  To the extent Shaughnessy has presented argument on this issue, however, the court assumes the claim is against both men.

18

facts and circumstances. *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 936, 803 N.E.2d 619, 625 (1st Dist. 2004). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Id.* (quoting *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90, 360 N.E.2d 765, 767 (1976)). Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id. See also Lopez*, 464 F.3d at 720 (quoting *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)) ("Extreme and outrageous conduct is that which goes 'beyond all bounds of decency and [is] considered intolerable in a civilized community.'")

The facts of this case in no way support Plaintiffs' IIED claims. Neither Justin nor Eliana has received any counseling or medical treatment as a result of the February 25, 2005 incident. According to their mother, Dr. Stalker, Eliana is "oblivious" to the incident and has not suffered any emotional distress at all. In Stalker's view, Eliana is only upset that her parents fight about Whitehouse's decision to file this lawsuit. (Def. Facts ¶¶ 82-84, 91.) Justin, too, is upset that his parents fight about the lawsuit, but after the incident occurred, Justin went back inside to finish practicing piano, and he was able to sleep through the night at all times. (*Id.* ¶¶ 79, 85, 91.) He also does well at school and functions well socially with his friends. (*Id.* ¶ 89.) According to Dr. Stalker, it is her husband who gets Justin worked up about the incident, which she believes started as a minor scuffle between boys on the bus, and if Whitehouse had not made the incident such a public spectacle, the kids would have forgotten most of it long ago. (*Id.* ¶¶ 86, 90.)

Significantly, Plaintiffs do not even address the IIED claims in responding to Defendants' summary judgment motions, which supports an additional finding that they have abandoned these meritless claims. *See, e.g., Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not presented to the district court in response to summary judgment are waived); *Kowalczyk v. Walgreen Co.*, No. 03 C 8335, 2005 WL 1176599, at *11 (N.D. Ill. May 17, 2005) (plaintiff abandoned claim under the Americans with Disabilities Act by failing to respond to

defendant's argument on that claim). Defendants' motions for summary judgment on the IIED claims is granted. *See Boyce v. Fernandes*, 77 F.3d 946, 951 (7th Cir. 1996) ("[I]f the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.")

### 2. Assault, Battery, Trespass

As for Whitehouse's remaining state tort claims, the court declines to exercise supplemental jurisdiction in the absence of any viable federal claims. The court therefore dismisses the assault, battery, and trespass claims. 28 U.S.C. § 1367; *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997) ("The general rule is that when as here the federal claim drops out before trial . . ., the federal district court should relinquish jurisdiction over the supplemental claim.")

## **CONCLUSION**

For the reasons stated above, Defendants' motions for summary judgment [Doc. 82, 86, 91] are granted. Defendants' motion to have certain facts deemed admitted [Doc. 131] is granted in part and denied in part as set forth in this opinion.

ENTER:

Dated: February 28, 2007

*Nan R. Nolan*
_____
NAN R. NOLAN
United States Magistrate Judge